Please the court. I'm attorney Nora Milner and I'm representing the petitioner in this case, Mr. Felix-Corona. I would like to reserve two minutes for rebuttal, please. The court has already been well briefed by both parties on to the major issues in this case regarding stop time and the re-papering matters. I would, however, like to address my arguments this morning to some issues that are within those primary matters for appeal. The first issue would be, does the Otorola case, which was decided by this court, does it stand for only the creation of a narrow exception into which the petitioner was to have to fit in order to retain relief? In other words, the government has argued that Otorola only stands for cases in which the petitioner can prove specific bad faith or misbehavior on the part of the government. The board's decision stated that since Mr. Felix-Corona could not prove that the government had engaged in any kind of misleading or bad faith activity, the Otorola case did not apply. So the board and the government have attempted to take the Otorola case and say that it is only an exception case. In fact, this court has never held that Otorola is only an exception case. The court in Otorola held that, in fact, IRA-IRA, the stop time rule of IRA-IRA, was not effective until the 1st of April, 1997, and that to apply it in any other way would contravene clear congressional intent on that matter, and that Congress had intended to provide a six-month delay in the effectiveness of the IRA-IRA stop time provision. The government would like us to believe, and would like this court to believe, that Otorola was only for those narrow cases in which the government had participated in bad faith, i.e., the government filing a frivolous appeal. But, in fact, the Otorola case is a much broader and, for purposes of the petitioner's case,  Otorola, although it may have been couched in terms of the government at that time exercising bad faith appeals, the court went well beyond that issue in looking at the Otorola case. In Otorola, this case also cited, this court also cited Estrera and pointed out that when the language of Congress is clear, there's no need to engage in the question of ambiguity, there's no need to extrapolate from other possible references, that when Congress has spoken, the intent is made clear. So, therefore, the government's attempt to narrow Otorola and state that because Mr. Felix Corona could not prove bad faith on the part of the government, that, therefore, he is not eligible to be included in the Otorola decision. The second rule, the second issue I would like to review with the court this morning is, is the general rule that the BIA should apply then current law, is that an absolute? In deciding Otorola, again, going back to this very, very important case, this court held in Castillo, Paris, that the principle of applying the then current rule is not an absolute, that particularly when it comes to non-discretionary procedural issues, that is not an absolute matter. For example, Mr. Felix Corona did not exercise his appeal in 1985 to buy time, to accrue physical presence. In fact, he had decided to appeal, to ask the board to look at a very specific issue, that is, did a one-month departure from the United States meaningfully interrupt the running of continuous physical presence? That was not a discretionary issue, that was a legal question that was put to the board in 1985. The issue, unfortunately, that the government has brought up of who delayed this case, who petitioned for reinstatement, who participated and what kind of delay, all it does is cloud, it serves to cloud the main issues of this case. Has that issue ever been addressed squarely by the BIA? The BIA, Your Honor, made a passing reference in its decision that because Mr. Felix Corona had himself requested reinstatement of his case, that therefore he did not fit between the parameters of the Otorola case. There's been a lot made by the government about who requested it. I understand that. I'm asking you, has the BIA ruled on the question whether the one-month visit in order to get married was a meaningful interruption of the continuous presence? In terms of Mr. Felix Corona's case, no, Your Honor, that issue has never been squarely dealt with. As Your Honor is well aware, that matter has been resolved in subsequent cases before this Court. But interestingly, Mr. Corona's case, Mr. Felix Corona's case, has never had a hearing on that particular issue, so you're absolutely right, that matter did remain unresolved. I'm interested in the question that you thought, General, I'd ask, which is, to what extent did the BIA actually get into this issue of how broadly Otorola should be applied? I mean, did it say, this is a, it only applies to frivolous appeal, it only applies to affirmative misconduct by the BIA, so we're not even going to weigh whether there are other equities that should be considered? You're absolutely correct, Your Honor, it's exactly what it did. In the last few sentences of its opinion, it said that, because Mr. Felix Corona's case does not fit within the narrow exception created by Otorola, he does not, he does not have an appeal. So they explicitly said, we're not going to look at the overall equities of this proceeding. There's no, Mr. Felix was the one who filed the, who sought to reinstate the appeal, therefore this cannot be a case where the INS, now Vice was sandbagging, so we're not going to go there, we're not even going to talk about that, and we're just going to apply the stop-time rule as we now read it, correct? That is exactly what the poor did, Your Honor, you're exactly saying that. So my follow-up question is, well, where is the line? Is Otorola simply an invitation in every single case for the, the applicant to say, well, I didn't do this because, I didn't do that because they did this to me? Where is the line? If it's not affirmative bad faith by the government, then where is it? I think the line, Your Honor, in Otorola is much broader. I believe that the Court held in Otorola that a case that was held on the merits and heard on the merits before the effective date of ira ira, the stop-time rule is inapplicable. And frankly, couching that in terms of the misbehavior of the government and where we want to take that misbehavior, for example, is stalling, is failure to respond to a motion, whatever, is that bad faith? I think this Court saw well beyond that. The Court was clearly irritated in Otorola about the federal subpoena. Well, okay, but that was a case where there was, with all due respect to the government, there was evidence of bad faith by the government. But then you have the Rahm case. Correct. And so there's clearly a point where you're not going to prevail on this argument. So what I'm trying to get from you is, I'm not expecting you to make the rule, but where should the line be between an Otorola kind of case and a Rahm kind of case? Your Honor, I would very much like to address that. In fact, I was going into that in exposition. Is the Rahm case really applicable to this, to Petitioner's case? When this Court was deciding Otorola, it acknowledged the dissent's position. The dissent's position in Otorola was that Rahm actually applied, that the stop-time rule as enunciated in Rahm should be the holding. And this Court in Otorola rejected that. And those reasons were very much similar and would answer your question and apply to the current Petitioner. First of all, in Rahm, it was a policy standpoint. This Court was, acknowledged the fact that appeals file, or a motion to reopen as it was done in Rahm, filed in order to accrue continuous physical presence, was exactly the reason that the stop-time rule was created. Exactly. And in Otorola, the Court said the shoe can be on the other foot now. The government is doing the same thing. But this Court went beyond that and said, we do not believe that this is a Rahm position, number one, for policy reasons. Mr. Felix Corona had already accrued his seven years. He did not file a motion to reopen. He was requesting an appeal based on the decision, or the request to review a very specific legal issue. That is, the issue of meaningful interruption of the continuous physical presence. Second, Mr. Felix Corona had already had his merits hearing and his appeal was already filed 12 years before even the enactment of IRA. So, unlike the Rahms, Mr. Felix Corona was well within the concepts of a pre-stop-time position. And third, in conjunction with Rahm, this Court said that it saw some ability or some reason even to limit the reach of Estrero. It said that although Estrero could have some retroactivity, that even nothing in Estrero permits meritless appeals. And that doesn't matter whether it's based on petition or whether it's based on the government. So, this Court has limited the applicability of Rahm. Mr. Felix Corona's case falls squarely within Otorola. It does not fall within Rahm, as argued by the government. I'd like to also now address with the Court the entire issue of the repapering. The government has argued that basically, repapering is nothing more than a series of policies. By some individuals within both the INS and the EOIR offices. That raises the question of just what effect do internal policies have? Even in the face of four policy memos on the subject of repapering, the government would have this Court believe that anything that's discretionary can be done in any way that the Attorney General may choose to do so. And while, to a certain extent, that's true, this Court and very few courts in the United States, actually, have looked at the issue of abusive discretion, have ever held that there is no jurisdiction to review abusive discretion matters. Now, while Mr. Felix Corona has not specifically brought to this Court his appeal based on an abusive discretion, one is left to wonder, what about Mr. Felix Corona's case makes him more or less worthy of repapering? The government has never given him a particular position as to what made his case unworthy. While Petitioner concedes clearly that this is a discretionary matter, we cannot, we are not arguing that, the Accardi Doctrine states an administrative agency is required to adhere to its own internal operating procedures. And furthermore, the Supreme Court in Morton v. Ruiz held, quote, where rights of individuals are affected. It is incumbent upon agencies to follow their own procedures. This is so even where the internal procedures are possibly more rigorous than otherwise would be required, end quote. And furthermore, it's clear that Congress did not intend to leave petitioners like Mr. Felix Corona with no remedy when they created the stop-time rule. In fact, Section 309C3 was enacted just for this purpose. If the government fails to enact congressional directives, then essentially they become, they're rendered meaningless, and that's essentially what's happened in the repapering case. Your Honor, in disclosing, Petitioner fully acknowledges that this is, the repapering is a discretionary issue. However, it is clear from congressional policy, it's clear from even the own internal policies of the service, and the EOIR, that there were procedures enacted, and the board sua sponte closed Mr. Felix Corona's case so that he could be repapered. We also would submit to the Court that it is fair to apply the stop-time rule in this case when Mr. Felix Corona's case was held 12 years well before the enactment of IRIRA. Thank you. Thank you, counsel. May it please the Court, Sol Greenstein on behalf of the Respondent. The Respondent posits that the Petitioner's case simply is not governed by Oterola. In Oterola, this Court carved out an extremely narrow exception to Rahm's general rule. In Oterola, the Petitioner clearly qualified and was indeed granted suspension of deportation by an immigration judge before April 1st, 1997, the effective date of the stop-time rule. However, despite the unambiguous fact that the stop-time rule first was to become effective on April 1st, 1997, the former INS filed a frivolous appeal with the board in which it argued that the stop-time rule applied prior to its effective date. This Court then issued its decision in Estrero in which it held that the stop-time rule did not apply to suspension of deportation cases pending prior to April 1st, 1997, pending and adjudicated. Nevertheless, the former INS did not retreat from its appeal and April 1st, 1997 passed and the stop-time rule went into effect. As a consequence, the board in Oterola was forced to hold that the stop-time rule applied to Oterola's application for suspension of deportation and are averse to the immigration judge's grant. Oterola appealed the board decisions to this Court and this Court ruled that the former INS's filing of a meritless appeal created a limited circumstance in which the case should be remanded to the board to allow it to apply pre-April 1st, 1997 law, thereby preventing the stop-time rule from attaching to Oterola's case. And I would refer this Court, I would refer to this Court, to the Court's statement in Oterola that allowing the INS to appeal a correct IJ decision on frivolous nondiscretionary procedural ground in order to avail itself of the stop-time rule would undermine clear congressional intent to enact a 180-day delay period. And I would also counter the petitioner's contention that the board didn't really address the limit of Oterola in its current decision. Cited by the respondent on appeal with respect to this issue only created a narrow exception for the situation in which DHS has filed a frivolous appeal in an effort to delay a final order until the stop-time provision was enacted by the past city of Oterola. I think that's true, because those are the facts that were presented in Oterola. But there are other ways of frustrating, and I'm not suggesting that the government did this here intentionally, but there are other ways of frustrating an applicant's rights. In other words, if a case has been completely argued and briefed and all the evidence has been taken and then it's just put in the freezer for 12 years, as was the case here, that would have the same effect as filing a frivolous appeal if it was done in bad faith, wouldn't it? If it was done in bad faith. But I would posit that there are several reasons why this Court should not apply Oterola to the incident case. Firstly, a frivolous appeal was never filed in the incident case. There has been absolutely no misconduct on the part of DHS. That's assuming that our Court reads Oterola narrowly the way you and the BIA do. But we have subsequent case law, which you cite extensively in your brief for purposes of discussing repapering, where our Court has said how we actually construe Oterola, and we don't construe it narrowly. I mean, I'm sure you're familiar with Note 1 and Alcarez. That's correct, Your Honor. So don't we have to follow that? Aren't we bound to follow it? I don't think a reband is necessary. No, no, we have to follow our own law. That's correct, Your Honor. But there are other reasons to differentiate Oterola from the incident case. No, I'm asking, I'm just saying, what do you do, what's your response to the fact that our Court has interpreted Oterola differently than, you know, more broadly than the BIA and what you posit today? I'm not convinced that this Court has interpreted Oterola that much more broadly. I don't think that's the standard. I'm not trying to convince you. You're trying to convince me. I understand. What we said here is, you know, for some reason should be disregarded. I mean, you know, we're bound to follow Ninth Circuit law. That's correct. Frankly, I'm sorry, I just don't have a response to that. Okay. Yeah, I can see your distinction between the government's actions in Oterola and the government's actions here. However, there is something about what the BIA did, because it never actually ruled on the question that's central to the claim. I mean, never, we agree with that. And I'm not sure I even understand what the BIA did when it sort of administratively closed the appeal and sent him off to go pursue legalization. Well, it was allowing for him to approach the former INS about getting repapered, and the former INS declined to repaper him. So then he, in reliance on doing what the BIA said he should do, then he still has yet to get an answer on the substance of his claim, right? In terms of the first appeal, in terms of the 1987 appeal. But I would posit that he could have gotten an answer to that claim well before the enactment of IRA-IRA. In 1987, the board continued proceedings to allow the petitioner to benefit and apply for legalization. The petitioner's application for legalization was denied, and the appeal was dismissed on May 28, 1993. And that's on the record at 442-443. The board's March 2, 1987 decision allowed either party to make a written request to the board to reinstate proceedings. Accordingly, the petitioner had four years between the denial of his legalization application and the effective date of the stop-time rule to get his proceedings recalendered and to get a suspension of deportation appeal adjudicated. And the respondent simply cannot be tasked with the petitioner's failure to do so in this case. Then they contact him later and say, you should reinstate your appeal. So they do take affirmative action. They don't take affirmative action during the four years when there wouldn't have been a stop-time rule. They take affirmative action many years later when there is a stop-time rule. And it's in response to that, they ask him to do it. He cooperates with them. He does what they ask him to do, and then he gets punished for it. Well, not necessarily, because the former INS filed the motion with the board to recalend the proceedings. But the petitioner could have filed that motion beforehand and had his... I understand. He could have done it before 1997, I take your point. But we're here today because of something that the government did. And you're saying the government couldn't have had the responsibility of proceeding with the appeal during the 1993 to 1997 window. But now they're doing it at a time when the rules are more favorable to the government. Right, but that's not necessarily in bad faith. I'm not suggesting that it is, but that's the situation. It's unfortunate for the Respondent, yes. Did this case go to mediation? I saw some notation. It did go to mediation, that's correct, Your Honor. And the mediation, presumably, from my discussions with the counsel at hand in mediation with my office, was to discern whether or not DHS was amenable to re-papering the Respondent, and DHS declined to do so in its prosecutorial discretion. All right. I would also note that this Court is precluded from reviewing the... Did you say prosecutorial discretion? Yeah, prosecutorial discretion. So is there some – what do you mean, prosecutorial? Well, in terms of its decision whether or not to terminate the order to show cause and re-initiate proceedings via a notice to appear and allow the Petitioner, in other words... I just didn't see. DHS isn't prosecuting the Petitioner for anything. No, but it's... It's discretion. It's administrative discretion. Sorry, then we're disagreeing on the term of art used, administrative discretion. Administrative discretion is probably more accurate. Okay. In Alcarez, this Court described DHS's deliberation as to whether or not to re-paper a Respondent as the second step, stating that the second step in the re-papering process involves a decision to commence or reinstate proceedings which would implicate 1252G and therefore be unreviewable, and that's at 1161 in that decision. So I would posit that DHS's decision declining to re-paper the Petitioner is absolutely unreviewable. So you're with the U.S. – you're with the Department of Justice? I'm with O.L. With the Office of Immigration Litigation. Oh, okay. Thank you. You didn't write this brief, right? No, Your Honor, yes. I'm just checking my notes very briefly to see if there's anything else I'd like to add. No. I would just conclude that this Court should firstly apply the general rule in ROM, decline to apply Oterola v. INS, and also hold that it does not have the jurisdiction to review DHS's decision declining to re-paper the Petitioner. All right. Thank you, counsel. Thank you, Your Honor.
judges: Wardlaw, Ikuta, Fogel